IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRITTANY ZARCO,

        Plaintiff,

v.                                                                                 Case No. 24-2091-JWB

BOOK AND LADDER, LLC,

        Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant's motion for summary judgment. (Doc. 30.) The motion has been fully briefed and is ripe for decision. (Docs. 31, 32.) The motion is GRANTED IN PART and DENIED IN PART for the reasons stated herein.

**I.    Facts**

The facts set forth herein are material to the issues on summary judgment and are either uncontroverted or viewed in a light most favorable to Plaintiff as the nonmoving party.

Defendant Book & Ladder, LLC, is a property management company that manages the Rockland apartment complex (the "property") in Lawrence, Kansas. Defendant employed Plaintiff at this property as a guest experience associate from July 25, 2022, through March 27, 2023. As a guest experience associate, Plaintiff's principal objective was to "create an environment that exceeds expectations of current and future guests, vendors and internal team through outreach, marketing, events and leasing efforts." (Doc. 30-5.) Defendant expected all associates to create and maintain a positive and professional workplace. (Doc. 30-6.) Defendant also maintained a conduct policy which identified certain behaviors as unacceptable and subject to disciplinary action, such as using abusive or threatening language, demonstrating insubordination, and creating

1

conflict with coworkers, supervisors, or guests. (*Id.* at 1.) This conduct policy states that the company typically follows progressive disciplinary action, where Defendant will usually issue a verbal or written warning prior to termination. However, some instances of misconduct will require immediate termination even for first-time offenses. (*Id.*)

Prior to Plaintiff's employment, she suffered a retinal detachment in her right eye and developed cataracts in both eyes. Plaintiff underwent surgery to re-attach her right retina prior to her employment with Defendant and has since regained 98% of vision in her right eye. (Plaintiff's Depo., Doc. 30-2 at 69:19–25.) Plaintiff testified that her visual impairments did not interfere with her ability to perform her job but that she did need to take breaks from the computer screen and wore blue light glasses. (*Id.* at 71:20–22; 72:13–20.) When Plaintiff interviewed for the position, she told Guest Accounts Director Kaelan Cameron and Allison Weber about her retinal detachment and that she was looking for more off-screen work. Plaintiff also informed them that she had two upcoming surgeries and that she would need time off for those. (*Id.* at 73:10–24.) Plaintiff's supervisors were aware that she needed screen breaks and never gave her any "push back" from taking those breaks. (*Id.* 74:9–18.) On October 25, 2022, Plaintiff received a positive performance evaluation that stated that she was exceeding all expectations. (Doc. 30-4.)

During Plaintiff's employment, Emanuel Fowler, a veteran with mental health issues, was a resident at the property. Fowler would regularly come into the leasing office to get coffee and talk to the employees. At times, staff would call the police or a mental health agency due to Fowler's conduct. At one point, Defendant attempted to ban Fowler from coming into the leasing office but it was unsuccessful. (Lay Depo. at 41:3–13.) Plaintiff's uncomfortable contacts with Fowler occurred almost every day she worked. He would ask her if she had a boyfriend or husband and if she wanted a boyfriend or a husband. Plaintiff would tell Fowler that he made her

uncomfortable and he responded by calling her a bitch. Plaintiff spoke to her managers about her concern, including Allison Weber. Defendant asserts that General Manager Cayce Lay told Plaintiff she could avoid Fowler by retreating into an office regardless of whether any other employees were available to assist Fowler; however, Plaintiff disputes that Lay made this statement. (Docs. 30 at 5–6; 31 at 9–10.) Fowler was ultimately evicted from the property after Plaintiff's termination.

On January 18, 2023, a resident reported that Nando Mandriquez, a maintenance technician, had come to her apartment on a work order and acted inappropriately. Mandriquez sat on her couch, asked the resident if she had a boyfriend, and asked her for a kiss (referred to as the "J10 incident"). (Doc. 30-14 at 8–9.) Plaintiff drafted a memorandum of record regarding sexual harassment at the property in late January or early February that was emailed to Lay and Matt Peters, Defendant's Regional Director, on February 12, 2023. (*Id.*) In that email, Plaintiff reiterated events regarding the J10 incident and also detailed incidents which occurred between Mandriquez and herself. According to Plaintiff, Mandriquez sent her an inappropriate text message, kissed her neck, and sat on her lap without her permission. The inappropriate text message occurred on September 14, 2022, in which Mandriquez sent her a message that stated "love that nice sweatet [sweater] yesterday hmmm." (*Id.* at 7.) Plaintiff did not report the text at that time but did send it to Lay on January 18, 2023. On another occasion in September or October 2022, the technician kissed Plaintiff on the neck after taking out her trash. (Plaintiff's Depo at 44:7–22.) Plaintiff testified that at the time she had thought he was trying to kiss her cheek and missed and assumed it was part of his culture to do that. (*Id.*) Plaintiff told Lay about this incident the next day she worked. (*Id.* at 45:6–15.) Finally, Plaintiff was uncomfortable when Mandriquez

3

sat on her lap in December 2022. Although Plaintiff did not make a report, at least two individuals in management were present when this incident occurred. (*Id.* at 47:2–10.)

According to Defendant's conduct policy, Defendant will promptly investigate every employee complaint regarding discrimination and harassment. (Doc. 31-4.) After the investigation, Defendant provides the results of the investigation to both the complainant and the accused. (*Id.*) However, Plaintiff did not receive any results regarding an investigation into her email complaint. Matt Peters testified that he sent Plaintiff's email on to Mark Miller, Defendant's vice president of operations, but that Miller took no further action. (Doc. 31-8 at 3.) Lay also testified that she did not take any action as to Plaintiff's email except for sending it up to management. (Lay Depo, Doc. 31-3 at 84:1–24.) Lay testified that the only investigation regarding sexual harassment that she performed during her employment with Defendant was with respect to the J10 incident. (*Id.* at 46:2–21.)

According to Lay, she met with Mandriquez after the J10 incident but before receiving Plaintiff's email complaint. (Lay Depo., Doc. 30-1 at 95:8–13.) In that conversation, she told Mandriquez that he would have to do sexual harassment training and that this was a final warning. (*Id.* at 85:12–86:16.) Lay testified that she doesn't know if the verbal warning was documented in Mandriquez's employee file. (*Id.* at 86:20–23.) Plaintiff disputes that this meeting occurred due to a lack of documentation.

Defendant uses a Paid Time Off ("PTO") system for leave and full-time employees with at least 30 days of service are eligible to use PTO. Plaintiff requested PTO in November for her eye surgeries. Plaintiff's right eye surgery was later rescheduled. Plaintiff sought and received approval for time off for her surgery from March 1 through March 16. (Plaintiff Depo. at 75:6–

16.)[1]  For the week of March 13, Plaintiff did not come to work and Lay considered her a no-call/no-show for that week.  (Lay Depo., Doc. 30-1 at 96:15–97:2.)  Lay was not at work during that week but recorded Plaintiff as a no-call/no-show when she came back from her own PTO.  According to Lay, Plaintiff had told the leasing manager that she had already sought and received approval for time off during the week of March 13.  (*Id.*)  Lay, however, did not think that Plaintiff requested that time off prior to her leave but instead that Defendant had retroactively granted the leave.  (*Id.*)

At some point in December 2022 or January 2023, Plaintiff had a conversation with Cameron during which Plaintiff expressed frustration that Defendant was not taking employee safety and sexual harassment seriously with respect to incidents involving Fowler.  (Doc. 31-2 at 1–3.)[2]  Shortly after the conversation ended, Plaintiff apologized to Cameron.  The next day, Plaintiff talked to Lay about her interaction with Cameron and told her that she had apologized to Cameron.  Plaintiff was not disciplined for this event at the time.[3]  (Lay Depo. at 99:17–25.)

On March 21, 2023, Plaintiff had a long conversation with Brett Williams.  Plaintiff told Williams that she sometimes felt uncomfortable representing the property because of the sexual

---

[1] Defendant asserts that Plaintiff only requested leave from March 1–7 and then followed up with a request from March 8–10. (Doc. 30 at 4.) In support of those facts, Defendant cites to Plaintiff's deposition testimony and an unauthenticated report. Plaintiff's deposition testimony, however, states that she requested time off from March 1 through March 16 at the outset. Further, the unauthenticated exhibit to which Plaintiff objects shows Plaintiff requested off dates from March 1 through March 16 and it is not apparent when the requests were made but they indicate that they were approved. (Doc. 30-8.) Therefore, the court views the evidence in a light most favorable to Plaintiff and finds that she requested time off from March 1 to March 16.

[2] Defendant objects to consideration of Plaintiff's affidavit on the basis that it is a sham affidavit and includes hearsay. Defendant argues that Plaintiff is attempting to create fact issues regarding conversations between her and her supervisors. (Doc. 32 at 6.) Defendant, however, fails to cite to any authority in support of its arguments. An affidavit based on personal knowledge is appropriate at summary judgment. Fed. R. Civ. P. 56(c). A party may move to strike an affidavit if it attempts to create a sham issue of fact. *L. Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009). This is typically based on a party presenting an affidavit which conflicts with testimony given in a deposition. *Id.* Defendant makes no assertion that Plaintiff's affidavit conflicts with any testimony in her deposition. The court has no basis from which to conclude that Plaintiff's affidavit is an attempt to create a sham issue of fact. Therefore, the court will consider her statements therein if they are based on personal knowledge.

[3] Plaintiff asserts that she was ultimately disciplined for this event because Defendant relied on it for her termination.

harassment incidents she had experienced. (Doc. 31-2 ¶¶ 17–18.) They also had conversations about prospective residents and their decisions to reside at the property. On April 15, 2023, Williams sent an email to Lay documenting his conversation with Plaintiff. In that email, which was sent after Plaintiff's termination, Williams detailed that Plaintiff stated she did not trust him, she did not believe that he knew what he claimed to know about leasing, she did not have to listen to him, she did not care about her job, and she was 0% invested in her position. (Doc. 30-16.) Plaintiff contends that she never made these statements. (Doc. 31-2 ¶¶ 21–22.)

On March 23, Plaintiff had a conversation with Williams, Weber, Meagan Tesser, and another leasing agent. The discussion pertained to ongoing issues with the trash service at the property. The parties dispute whether Plaintiff's vocal statements about these issues were at an appropriate volume for the workplace. Notably, the report regarding the incident was emailed to Lay by Weber on April 14, 2023. (Doc. 30-15.) It is undisputed, however, that none of the managers gave Plaintiff any verbal or written discipline about the March 21 or 23 alleged incidents. Lay testified that she did not discipline Plaintiff because she didn't think it would be productive. (Lay Depo. at 109:8–23.) Further, Lay testified that she did not talk to Plaintiff about these events at the time they occurred. (*Id.*) Lay believed that Plaintiff had an attitude that was causing a negative effect on the workplace. (*Id.* at 152:12–20.)

Lay consulted with Peters and she recommended termination of Plaintiff's employment due to Plaintiff's attitude. (*Id.* at 109:24–111:6.) On March 27, Lay met with Plaintiff and told her that she was terminated due to her confrontations with Weber and Cameron and due to Plaintiff's change in attitude affecting the office. The personnel action form Lay prepared indicates that Plaintiff was terminated due to her "attitude effecting [sic] position." (Doc. 30-21.)

On September 27, 2023, Plaintiff filed a charge of discrimination with the Kansas Human Rights Commission and the EEOC. (Doc. 30-19.) In response to the charge, Defendant indicated that Plaintiff was terminated due to Plaintiff's "interactions with management" and an unapproved PTO request. (Doc. 30-14 at 3.)

On March 13, 2024, Plaintiff filed this action alleging claims of sex discrimination and retaliation in violation of Title VII and disability discrimination and retaliation in violation of the ADA. Defendant moves for summary judgment on all claims.

## II.  Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 935 F.2d 1106, 1110 (10th Cir. 1991). The court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.  Analysis

### A.  Title VII

### i. Sex Discrimination

Plaintiff's first claim is one of sex discrimination under Title VII. To succeed on this claim, Plaintiff "must prove that *intent* to discriminate *based upon* [the] plaintiff's protected class characteristics was the determining factor for the allegedly illegal employment decision." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022). Plaintiff may either rely on direct evidence of "discrimination or use the three-step burden-shifting framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Here, Plaintiff is relying on the burden-shifting framework of *McDonnell Douglas* since she lacks any direct evidence of sex discrimination.

Under that framework, Plaintiff must first establish a prima facie case of discrimination. The elements to establish a prima facie case under *McDonnell Douglas* "may vary depending on the context of the claim and the nature of the alleged conduct." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 n.1 (10th Cir. 2015). The preferred framework, however, is a three-prong prima facie test articulated by the Supreme Court in *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981). *See Bennett*, 792 F.3d at 1266 n.1. Under this preferred framework, the evidence must demonstrate that (1) Plaintiff belongs to a protected class; (2) she suffered an adverse employment action; and (3) "the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). The burden then shifts to Defendant to proffer a "legitimate non-discriminatory purpose for the adverse employment action." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216–17 (10th Cir. 2013). If Defendant meets this burden, the burden shifts back to Plaintiff to show "her sex was a determinative factor in the [] employment decision, or show[s] the [employer's] explanation for its action was merely pretext." *Id.* at 1217.

Here, Defendant concedes that Plaintiff has met the first two elements of the prima facie case. Nevertheless, Defendant argues that she has not shown that her termination took place under circumstances giving rise to an inference of sex discrimination. In response, Plaintiff argues that the evidence shows that she was a "victim of unlawful sex-based stereotyping" and that she was treated worse than similarly situated men. (Doc. 31 at 28.) With respect to the first argument, Plaintiff asserts that Defendant discriminated against her because she did not conform to stereotypical gender norms. The pretrial order does not preserve a claim of sex discrimination based on failure to conform to stereotypical gender norms. *See Potter v. Synerlink Corp.*, 562 F. App'x 665, 674 (10th Cir. 2014) (discussing a plaintiff's burden in a stereotyping claim). Rather, the pretrial order states that she was terminated because she was "stereotyped" as a "complainer" and treated differently than males. (Doc. 29 at 4.) The court finds that Plaintiff did not preserve her sex discrimination claim on this basis.

In any event, Plaintiff's evidence on this point does not meet her burden. Plaintiff asserts that Defendant discriminated against her because she was not a typical demure woman who didn't complain. Essentially, Plaintiff argues that she complained about her treatment to her managers and she was persistent in doing so. The court agrees that the evidence viewed in a light most favorable to Plaintiff supports that she did take that action. Plaintiff then makes a leap to assert that her complaining was viewed as her being nonconforming to gender norms because women should be quiet and demure. (Doc. 31 at 29.) Plaintiff, however, fails to point to any evidence that this was Defendant's belief or position, such as a statement by a manager that women should not complain or speak up. Without any evidence that Defendant believed Plaintiff failed to conform to stereotypical gender norms, Plaintiff cannot make a prima facie case.

Next, Plaintiff asserts that she can meet her prima facie case by showing differential treatment. Essentially, Plaintiff argues that Defendant treated her and Mandriquez differently and that this supports her claim of sex discrimination. A plaintiff may meet her prima facie burden by showing that an employer treated similarly situated employees more favorably. *PVNF, L.L.C.*, 487 F.3d at 800. Defendant argues that Plaintiff is not similarly situated to Mandriquez. "Individuals are considered 'similarly-situated when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of comparable seriousness." *Id.* at 801. The record shows that both Plaintiff and Mandriquez were disciplined by Lay. Further, Defendant does not dispute that they were both subject to the same polices. Defendant, however, argues that they are not similarly situated because they did not engage in conduct of comparable seriousness.

In considering this issue, the court is to "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000). In undertaking this task, the court looks at the conduct surrounding the policy violations. *Id.* Here, Plaintiff and Mandriquez had different positions and different duties. Mandriquez performed maintenance duties and Plaintiff was a guest experience associate. Mandriquez was given a verbal warning for making inappropriate sexual comments to a resident. According to Defendant, Plaintiff was terminated due to three incidents during which she behaved inappropriately.[4] In one conversation, she allegedly told her supervisor that she would not accept direction from him and was zero percent invested in her position. Based on the facts,

---

[4] Plaintiff also argues that the conduct is similar because she was disciplined for making a report of sexual harassment and Mandriquez engaged in sexual harassment. (Doc. 31 at 30.) This conduct, however, is not a policy violation. Rather, it is Plaintiff's assertion as to the reason for her termination.

Mandriquez's conduct involved inappropriate sexual conduct with a resident (and also with Plaintiff) while Plaintiff's conduct involved insubordination and refusal to take direction from a supervisor.  While sexual harassment is presumably a serious policy violation, the differences in both employees' alleged conduct and their employment roles are too vast for the court to find that they are similarly situated to each other.   Therefore, the court finds that Mandriquez's conduct was not sufficiently similar to Plaintiffs to permit an inference of discrimination on the basis of disparate treatment.

Defendant's motion for summary judgment on Plaintiff's sex discrimination claim is granted.

### ii. Retaliation

Next, Plaintiff alleges that Defendant retaliated against her for engaging in protected activity.  Plaintiff must establish this claim under the burden-shifting framework in *McDonnell Douglas*.  Under that framework, Plaintiff must first establish a prima facie case of retaliation by showing 1) that she engaged in protected opposition to discrimination, 2) "that a reasonable employee would have found the challenged action materially adverse," and 3) "that a causal connection exists between the protected activity and the materially adverse action."  *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (quoting *PVNF, L.L.C.*, 487 F.3d at 803).  After establishing her prima facie case, the burden shifts to Defendant "to come forward with a legitimate, non-retaliatory rationale for the adverse employment action.  If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Id.* (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015)).   Defendant does not dispute that the first two elements are met here.  (Doc. 30 at 21.)

Turning to the disputed element, Plaintiff must show a causal connection between her protected activity and termination. Although a retaliatory motive may be inferred when adverse action closely follows protected activity, a long period of time will not suffice to show a causal connection. *See e.g., Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) ("If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection."). However, a temporal proximity of one and a half months has been found to be close enough in time to show causation. *Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*, 460 F. Supp. 3d 1167, 1205–06 (D. Kan. 2020), *aff'd*, 851 F. App'x 828 (10th Cir. 2021) ("The Tenth Circuit has held that a one and one-half month period – about the same interval here between plaintiff filing her EEOC Charge and her job termination – may, by itself, establish causation.") (internal quotation omitted).

Here, Plaintiff was terminated approximately six weeks after emailing her complaint of sexual harassment. Therefore, the court finds that Plaintiff has met her burden. The burden shifts to Defendant to put forth a nondiscriminatory basis for her termination. Defendant asserts that it terminated Plaintiff for nondiscriminatory reasons, including that Plaintiff was insubordinate by yelling and having a bad attitude about her workplace and supervisors. The court finds that Defendant has met its burden and now the burden shifts back to Plaintiff to show that Defendant's explanation for its action was merely pretext. *Tabor*, 703 F.3d at 1217.

To satisfy this step, Plaintiff must show that Defendant's asserted reason "was not the true reason for the employment decision." *Id.* at 1218 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). Plaintiff can show pretext by (1) "showing that the proffered reason is factually false or (2) by showing that discrimination was a primary factor in the employer's decision, which is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (quoting *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (quotations omitted)). "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether a reasonable factfinder could rationally find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025) (quoting *Lounds*, 812 F.3d at 1234). Moreover, a plaintiff need not provide affirmative evidence of discrimination beyond her prima facie case and evidence of pretext. *Id.* "The plaintiff need not show both that the defendant's reasons were a pretext and that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination." *Id.* (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003)).

In this case, the court finds that Plaintiff has put forth evidence of pretext and this claim presents a question of fact for a jury. Plaintiff sent her email complaint regarding sexual harassment on February 12. Plaintiff was off work for her surgery from March 1 through March 16. Shortly after she returned, she allegedly engaged in conduct that resulted in her termination. The parties have vastly different views of what occurred on March 21 and 23 and the emails sent to Lay regarding these events were sent weeks after the conversations occurred and after Plaintiff's termination. According to Lay, she did not talk to Plaintiff about what occurred on March 21 or 23 prior to her termination. (Lay Depo. at 112:2–20.) *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (A "failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext.")

Further, Plaintiff's only evaluation she received while employed by Defendant was positive and Plaintiff was not disciplined for any alleged policy violation prior to her termination. Defendant's explanation for the failure to discipline Plaintiff was that such discipline would not be helpful. A jury could find such an explanation implausible in light of the fact that Plaintiff was never told that she violated a policy and that she needed to correct her behavior. Further, a jury could find that Defendant's change in position after her good review was the result of Plaintiff's repeated complaints about sexual harassment instead of these disputed conversations.

Moreover, although Defendant asserts that Mandriquez was verbally disciplined by Lay for his conduct regarding the J10 incident, there is no evidence that he was disciplined or counseled after Plaintiff's complaints regarding his reported conduct towards her. There is no evidence that Defendant ever investigated Mandriquez after Plaintiff complained of the events at the time they occurred or after her email complaint in February. For all of these reasons, a jury could find that Defendant's explanation for Plaintiff's termination is not credible.

Therefore, Defendant's motion is denied with respect to Plaintiff's retaliation claim.

**B. ADA**

   **i. Discrimination**

Plaintiff asserts that Defendant discriminated against her in violation of the ADA. The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Like the sex discrimination claim, ADA discrimination based on circumstantial evidence is analyzed under the *McDonnell Douglas* burden-shifting framework. *Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 538 (10th Cir. 2014). Plaintiff must first establish a prima

facie case of disability discrimination by showing: (1) that she is disabled or perceived as disabled, as defined by the ADA, (2) that she is qualified to perform the essential functions of the job, and (3) she was terminated "under circumstances which give rise to an inference that the termination was based on [her] disability." *Id.* at 544. Defendant moves for summary judgment on the basis that Plaintiff cannot establish the first and third prongs of her prima facie case.

To prove that she is disabled[5], Plaintiff must: "(1) have a recognized impairment; (2) identify one or more appropriate major life activities; and (3) show that the impairment substantially limits one or more of those activities." *Sanchez v. Vilsack*, 695 F.3d 1174, 1178 (10th Cir. 2012). Defendant does not dispute that Plaintiff has a vision impairment due to her retinal detachment that affects the major life activity of seeing. Defendant, however, disputes that Plaintiff's impairment substantially limits seeing. (Doc. 30 at 22–23.) In response, Plaintiff asserts that this is a jury question. The Tenth Circuit has held that "whether the impairment substantially limits a major life activity is ordinarily a question of fact for the jury;" however, "it is not sufficient for a plaintiff to identify an impairment and leave the court to infer that it results in substantial limitations to a major life activity." *Sanchez*, 695 F.3d at 1178, 1179.

An "impairment is substantially limiting when it renders an individual significantly restricted in her ability to perform a major life activity compared to the average person in the general population." *Id.* at 1178 (quotation and citation omitted). In determining whether Plaintiff has established her burden, the court considers the nature and severity of the impairment, duration of impairment, and any permanent or long term impact from the impairment. *Id.* Reviewing the facts set forth by the parties, the only evidence regarding Plaintiff's vision is that she had retinal detachment, surgeries to correct the detachment, and that she needs to take screen breaks

---

[5] Plaintiff does not contend that Defendant perceived her as disabled. (Doc. 29 at 4–5.)

periodically. Further, Plaintiff's vision in her right eye was restored to 98%. Plaintiff argues that her vision was worse during her employment with Defendant but Plaintiff failed to put forth any evidence of how her visions was significantly restricted as compared to the average person. (Doc. 31 at 35.) Rather, Plaintiff merely argues that the fact that she had a retinal detachment and needed screen breaks is sufficient to meet her burden. (*Id.*) The court disagrees. The evidence is that Plaintiff could perform her job and that her vision did not limit her ability to perform her job with the exception of taking breaks. Moreover, there is no evidence regarding the number and frequency of breaks for this court to determine whether it was substantial. Further, there is no evidence from which the court could conclude that her ability to see is significantly restricted as compared to the average person. The court cannot infer that Plaintiff's vision was substantially limited merely because of her condition and Plaintiff has not put forth evidence from which the court could determine that Plaintiff has created a dispute of material fact on this issue.

Therefore, Defendant's motion for summary judgment on Plaintiff's ADA discrimination claim is granted.

### ii. Retaliation

Finally, Plaintiff has brought forth an ADA retaliation claim. The court notes that it has determined that Plaintiff was not actually disabled as set forth herein. Even if not disabled under the ADA, Plaintiff may proceed with an ADA retaliation claim if she has a reasonable good faith belief that she had a disability. *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir. 2001). Defendant did not raise any argument concerning Plaintiff's good faith belief that she had a disability. Therefore, at this stage, the court will presume that Plaintiff can proceed with a retaliation claim. Defendant may present this issue for the jury's consideration.

To make a prima facie case of retaliation under the ADA, Plaintiff must show that (1) she engaged in protected activity; (2) a reasonable employee would find the action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. *Winston v. Ross*, 725 F. App'x 659, 664 (10th Cir. 2018) (citing *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011)). If Plaintiff can establish a prima facie case, then Defendant can rebut it by showing a legitimate nondiscriminatory reason for the adverse action. *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007). Then the burden shifts back to Plaintiff to show that the stated reason is mere pretext. *Id.*

Here, Defendant does not dispute that Plaintiff engaged in protected activity by taking leave for her surgery and that termination is an adverse action. Defendant asserts that it is entitled to summary judgment because Plaintiff cannot show a causal connection between the two events. (Doc. 30 at 26.) Plaintiff sought and was approved for medical leave from March 1 through March 16. Plaintiff was then terminated on March 27. Because of the close temporal proximity between her leave and termination, the court may infer causation. *Fisher*, 460 F. Supp. 3d at 1205.

Next, the court again finds that Defendant has put forth a legitimate nondiscriminatory reason for Plaintiff's termination. The burden then shifts back to Plaintiff to demonstrate pretext. As noted herein, Plaintiff has put forth evidence of pretext. As significant to this claim, Plaintiff has put forth evidence that she sought and her leave of absence was approved from March 1 to March 16. Defendant, however, marked Plaintiff as a no show during the week of March 13th. Although Defendant now argues that it retroactively allowed Plaintiff to use PTO during that week and did not terminate her for taking leave, Defendant told the KHRC that one of the grounds for her termination was her failure to appear at work during the week of March 13. (Doc. 30-14 at 3.)

Therefore, a jury could conclude that Defendant's stated reasons for termination are unworthy of belief.

Defendant's motion for summary judgment on Plaintiff's ADA retaliation claim is denied.

## IV. Conclusion

Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to Plaintiff's Title VII sex discrimination claim and her ADA discrimination claim. It is denied in all other respects. Due to a scheduling conflict, trial in this matter is reset to October 27, 2025.

IT IS SO ORDERED. Dated this 2nd day of June 2025.

                                                            __ _s/ John Broomes_____
                                                            JOHN W. BROOMES
                                                            UNITED STATES DISTRICT JUDGE